UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KAREN M. BUTLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | No. 2:09CV00037 AGF |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Karen M. Butler was not entitled

to supplemental security income under Title XVI of the Social Security Act, 42 U.S.C.

§§ 1381-1383f.  For the reasons set forth below, the decision of the Commissioner shall

be affirmed.

Plaintiff, who was born on June 12, 1962, filed for benefits on November 8, 2006,

at the age of 43, alleging a disability onset date of January 15, 2006, due to degenerative

disc disease, hypertension, obesity, and mental impairments.  After Plaintiff's application

was denied at the initial administrative level, she requested a hearing before an

Administrative Law Judge ("ALJ") and such a hearing was held on March 11, 2009.  By

decision dated March 26, 2009, the ALJ found that Plaintiff had the residual functional

capacity ("RFC") to perform sedentary work with limitations for jobs available in the national and local economy.  Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 28, 2009.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision was not supported by substantial evidence in the record as a whole because the ALJ failed to give proper weight to the opinions of Plaintiff's treating physicians.

## BACKGROUND

### Work History and Application Forms

Plaintiff reported that she worked full-time as a waitress, dishwasher, and bus person at Maggie's Café from 2001 until August 8, 2006.  In that position, Plaintiff waited tables, ran the cash register, and washed dishes.  Prior to working at Maggie's Café, Plaintiff worked as a "seasonal worker" at a plant nursery from 2001 until 2003. (Tr. 136, 159, 193.)

Earnings records indicate that Plaintiff earned $751.85 in 1978, $1,484.77 in 1979, and $499.89 in 1980.  Between 1981 and 1983, Plaintiff earned between $9,740.44 and $11,664.29.  In 1984, Plaintiff earned $2,206.36, and in 1985 she earned $1,270.09. Plaintiff earned $26.22 in 1986, and in 1987 had no earnings.  In 1988, Plaintiff earned $1,411.02, but only earned $148.75 in 1989.  Plaintiff had no earnings for 1990 and 1991.  In 1992, Plaintiff earned $1,110.67, and in 1993, Plaintiff earned $9,314.30.  In

1994, Plaintiff earned $405, and in 1995, Plaintiff earned $2,699.25.  Plaintiff had no earnings for 1996 and 1997.  Plaintiff earned $2,871.70 in 1998, $528.75 in 1999, $708.15 in 2000, $5,867.60 in 2001, $10,617.98 in 2002, and $2,565.54 in 2003.  Plaintiff had no earnings in 2004.  Plaintiff earned $2,979.65 in 2005, and $6,082.69 in 2006.  (Tr. 110.)

**Medical Record**

Plaintiff was treated by Eric Kondro, M.D., her primary care physician, from February 2001 through November 2008, for various medical complaints.  (Tr. 303-47.)  She first complained of right hip pain on January 23, 2006, and Dr. Kondro's office referred her to an orthopedic specialist.  (Tr. 323.)

A February 7, 2006 MRI of Plaintiff's lumbar spine revealed some end stage spondylosis at the L5-S1 segment.  (Tr. 249, 254.)  A February 14, 2006 CAT scan revealed the same condition.  (Tr. 246.)  On February 28, 2006, John Miles, M.D., Plaintiff's orthopaedist, stated that Plaintiff had end stage spondylosis at the L5-S1 segment, and noted that Plaintiff wished to proceed with surgical intervention.  (Tr. 213.)

Plaintiff was admitted to Columbia Regional Hospital on March 1, 2006 with an admitting diagnosis of lumbar spondylosis L5-S1, hypertension, anxiety disorder, migraine headaches, and hyperlipidemia.  Plaintiff underwent an anterior lumbar interbody fusion surgery.  Having "tolerated the procedure well," Plaintiff was discharged on March 4, 2006.  (Tr. 208-27.)

On May 24, 2006, Plaintiff visited Dr. Kondro.  Plaintiff stated that she felt "pretty

good since surgery" and denied any complaints. (Tr. 325.) On July 25, 2006, Plaintiff visited Dr. Miles, reporting some lower back pain. Dr. Miles noted that Plaintiff's waitressing work involved very physical labor. He stated that Plaintiff was healing satisfactorily and suggested continued core strengthening and activity modification, along with smoking cessation. Dr. Miles restricted Plaintiff from doing dishes at work. (Tr. 242.)

On October 14, 2006, Plaintiff injured herself at work while lifting food trays that weighed over 30 pounds. (Tr. 240-41.) On October 16, 2006, Plaintiff saw Randal Trecha, M.D., a doctor in Dr. Miles's office, for significant lower back pain. Plaintiff reported doing "fairly well" until the incident at work. Dr. Trecha recommended that she not work for a week. (Id.)

An MRI taken on October 20, 2006 revealed a "[p]revious anterior fusion at the lumbrosacral spine," but "no acute focal compromise" and "[n]o abnormal enhancing lesions." (Tr. 205-07). Dr. Miles noted that it was "a very clean appearing MRI." Dr. Miles also noted that Plaintiff reported getting relief from sitting, her manual motor testing revealed no deficits, and she was taking Oxycontin for her pain. (Tr. 239.)

On November 7, 2006, Jennifer Clark, M.D., performed an EMG/NCV study on Plaintiff's right leg, which Dr. Clark reported was "[e]ssentially normal," with some mild irritability in the gastroc. (Tr. 255-57.) That same day, Plaintiff saw Dr. Miles for pain in her right buttock which had moved to her left buttock. Dr. Miles noted that "[o]n examination, [Plaintiff had] full motor function in her lower extremities" and that she had

an "essentially normal EMG/NCV study of her right leg" with "a little irritability of the tibial nerve proximally." Dr. Miles indicated that Plaintiff "would like to have a note to be off work altogether," which he thought was reasonable, and that he thought she would apply for social security disability. (Tr. 237.) Dr. Miles provided Plaintiff with an Information Sheet stating that due to Plaintiff's non-work related condition, she was "not able to return to work at this time." (Tr. 230.)

Plaintiff's daughter, Rachel Collins, completed a Third Party Adult Function Report on Plaintiff on December 1, 2006. Ms. Collins reported that Plaintiff was responsible for taking care of her husband and three children, as well as cooking and cleaning. Plaintiff also fed and watered the pet dog. Ms. Collins reported that Plaintiff had no problems feeding herself or using the toilet, but needed help shaving because she could not bend her lower back, was unable to dress herself because of pain, and was unable to get out of the bath because her legs would go numb. Ms. Collins reported that Plaintiff prepared meals for herself and her family of five on a daily basis, but needed help lifting heavy items, and required approximately 30 to 45 minutes to prepare a meal. (Tr. 142-50.)

Ms. Collins reported that Plaintiff did the dishes and vacuumed every day, and did two loads of laundry every other day; however, Plaintiff needed help with the laundry because she could not walk up and down stairs with any heavy loads. Ms. Collins reported that Plaintiff traveled outside once or twice a day for mail and the dog, was also able to drive, and was able to grocery shop once a week for approximately two and a half

hours; however, Plaintiff used a wheelchair when shopping and needed help lifting heavy

objects.  Ms. Collins stated that Plaintiff was unable to work on her yard or garden, to sit

or stand for more than 25 minutes, travel any long distances, lift more than ten pounds,

climb stairs, bend, reach, get up after she knelt down, or complete tasks after her lower

back began to hurt.  (Id.)

Plaintiff completed an Adult Function Report on herself on December 1, 2006,

reporting substantially the same information as Ms. Collins reported in her Third Party

Adult Function Report.  However, Plaintiff reported that her two adult children helped

when they were at her house, and her husband helped when he came home from work.

Plaintiff reported that she had to hold onto the towel rack when getting on and off the

toilet.  She also reported that while she prepared meals daily, it took an hour and a half to

two hours to prepare a full meal.  Plaintiff reported that she only did one load of laundry

if she was feeling "okay."  She reported that while she drove, she sometimes had to stop

and get out and walk around.  (Tr. 151-58.)

On December 26, 2006, Mark Maddox, Ph.D., the state agency medical source,

reviewed Plaintiff's medical records.  Dr. Maddox found that Plaintiff had anxiety and

depression, but that her symptoms were so mild that Dr. Maddox characterized her

impairments as "Not Severe."  (Tr. 259-69.)

Plaintiff returned to Dr. Miles on January 16, 2007, following a visit with a

neurologist.  The neurologist had expressed concern to Dr. Miles about possible

psychiatric issues with Plaintiff.  On examination, Dr. Miles noted that she was quite

tearful, had full motor function of her lower extremities, was still smoking, and he suspected that she had a "nonunion." Dr. Miles proceeded to give Plaintiff a caudal epidural steroid injection for pain management. (Tr. 286.)

On February 6, 2007, Plaintiff saw Donald Joseph Meyer, Jr., M.D., Ph.D., for pain management. Her chief complaint was bilateral buttock spasms, with the right greater than the left, and bilateral posterior thigh pain. She also complained of right leg and foot parcathesias, "especially when driving." Upon entering the exam room, Dr. Meyer found Plaintiff standing, and Plaintiff reported that she had just driven one hour. Dr. Meyer noted that Plaintiff had an erect stance and normal gait, and was able to heel walk and toe walk. Following examination of Plaintiff, Dr. Meyer recommended that Plaintiff discontinue her weekly Demerol shots, continue taking Neurontin, start taking Zanaflex to help with muscle spasms and pain, and start taking Cymbalta. He also recommended she schedule bilateral lumbar medical branch blocks at L4-5 and L5-S1, and attend "Living Better with Pain" classes. Dr. Miles noted that Plaintiff suffered from persistent pain and depression. (Tr. 278-81.) On February 26, 2007, Dr. Meyer performed bilateral lumbar medical branch blocks at L4-5 and L5-S1 on Plaintiff. (Tr. 282.)

On March 22, 2007, Plaintiff was evaluated by Timothy Graven, D.O., having complained of long, ongoing back, buttock, and right leg pain, as well as numbness and tingling. Dr. Graven noted that he believed that Plaintiff had radiculopathy with ongoing problems. (Tr. 290.)

An MRI of Plaintiff's lumbar spine dated March 29, 2007 indicated mild disc bulge and small central disc herniation at L2-3 and L3-4 with neural compression, and mild degenerative disc disease at L4-5 with mild facet osteoarthritis. (Tr. 298-99.) On April 12, 2007, Plaintiff met with Dr. Graven to follow-up on her MRI. Dr. Graven counseled Plaintiff regarding spinal cord stimulation and noted that Plaintiff's pain was relieved with a Duragesic patch. (Tr. 291.) On June 21, 2007, Dr. Graven noted that Plaintiff felt the spinal cord stimulator was doing a good job. (Tr. 293.)

On October 1, 2007, Plaintiff reported to Dr. Kondro that she was having a good day with "not much back pain." (Tr. 331.)

On December 6, 2007, Plaintiff was evaluated by Dr. Graven for weakness in her legs, which was following her pain. Plaintiff reported that the stimulator was only providing relief from the waist level, or belt line, down, and Plaintiff was experiencing pain up in her lower- and mid-back. Dr. Graven noted that Plaintiff would be reprogrammed next week. (Tr. 295.)

On February 7, 2008, Plaintiff was evaluated by Dr. Graven for follow-up on her stimulator. Dr. Graven's physical exam revealed nothing abnormal. (Tr. 296.)

**Evidentiary Hearing of March 11, 2009 (Tr. 18-41)**

Plaintiff, who was represented by counsel, testified that she was 46 years old, married with a 13 year old daughter, and had a 12th grade education. Plaintiff stated that she had worked as a waitress for five years, until she hurt her back lifting ice in October 2006. Plaintiff testified that earlier in her time working as a waitress, she also had

worked in a plant nursery during the mornings, before her evening waitressing shifts.

Plaintiff testified that she had low wages for 1999 and 2000 because she had been working part time. She testified that she didn't have any income in 1996 and 1997 because she was not working during that period.

Plaintiff testified that her "chronic pain" was due to spasms that came from the top of her buttocks down to her thighs. She testified that she had these spasms "all the time" and had to sit and rest in between activities because of the spasms. Plaintiff testified that in March 2006, she had a fusion of the L5, S1, and an October 2006 MRI showed post-operative changes, with no stenosis or compromise of the spinal canal, allowing Plaintiff to return to work.

Plaintiff testified that halfway through a shift at work, she was carrying a heavy tray of food, fell down, and could not get back up. She testified that both a February 2007 CT scan and an April 2007 MRI came back normal. Plaintiff testified that she had been told that her spasms may have been caused by Dr. Miles, who may have cut into a nerve on accident; however, Dr. Kondro and Dr. Graven called her spasms "nerve damage." Plaintiff testified that she had a spinal cord stimulator inserted into her body to alleviate the pain, requiring surgery every five years to change the batteries in the stimulator.

Plaintiff testified that she could not walk through Wal-Mart without a cart, could stand for 20 minutes with a cane, had problems sitting down, and on "bad spasm days" had to lay on her stomach. Because of the spasms, she was no longer able to landscape,

pick up her grandchildren, bend down on the floor to play with her grandchildren, or drive to her daughter's school.

Plaintiff testified that she smoked about a pack and a half a day because she was bored and it kept her from eating. She weighed 210 pounds, she was able to lift eight-pound weights, she kept her cell phone with her at all times in case she fell, she could not go up and down steps because it "extremely hurts," and she did not have good balance. In addition, she testified that her medicine makes her "kind of goofy." She was taking medicines for blood pressure, cholesterol, pain, and muscle spasms, in addition to Xanax and Prozac for depression. She had not received any additional treatment for her depression, other than one weekend of in-patient treatment.

Plaintiff testified that she had been falling "more," and that when she fell, her right leg stayed numb for approximately 20 minutes. When Plaintiff fell, her husband would bring her a walker, which Plaintiff used to lift herself off the floor. Plaintiff then either took her medication or rubbed Biofreeze on her body, and laid down until she felt better, which sometimes took days. Plaintiff testified that she never knew when she was going to fall and, as a result, Plaintiff was scared to drive; however, Dr. Kondro left the decision of whether or not to drive up to Plaintiff.

Plaintiff testified that she was able to sit for approximately an hour before she had to change positions due to her spasms, and that her spasms also affected her sleep because she had to keep changing positions.

Plaintiff stated that she needed medication for her spasms five out of every seven

days, and the stimulator was on at all times. When she was unable to control the pain with medication, Dr. Kondro gave her a shot of Demerol. Plaintiff testified that her medications made her sleepy, caused her to slur her speech, and negatively affected her concentration and memory.

The Vocational Expert ("VE") reviewed Plaintiff's work history, noting that the only job at which she was able to earn substantial gainful wages was her position as a waitress, which he noted was actually a combination of jobs. The waitress work was light and semi-skilled, but medium as Plaintiff performed the job. Plaintiff also reported dishwashing, which was like a kitchen helper, and categorized as medium and unskilled, and cashiering, which was categorized as light and unskilled. Plaintiff's prior work as a nursery worker was classified as heavy and unskilled.

The VE testified that an individual with Plaintiff's age, education, and work experience, who is limited to performing sedentary exertion level work, who can occasionally climb stairs and ramps, never climb ropes, ladders and scaffolds, who can occasionally bend, balance, stoop, kneel, crouch and crawl, but should avoid unprotected heights and hazardous machinery, and who was limited to performing simple tasks or unskilled tasks only, could not perform any of Plaintiff's exact past jobs, but could perform jobs such as a surveillance system monitor in a business or a retail store, simple assembly work, or packing pharmaceuticals, CDs, or small things. The VE testified that each of those jobs was available in both the local and national economies. The VE testified that those jobs could frequently alternate sitting and standing, ranging from 30

minutes, or 34% of the time, to 66% of the time.

The VE then testified that an individual with Plaintiff's age, education, and work experience, who is limited to performing sedentary exertion level work, who can occasionally climb stairs and ramps, never climb ropes and scaffolds, who can occasionally balance, but can never stoop, bend, kneel, crouch, or crawl, and can not push or pull with the lower extremities, and who should avoid unprotected heights and hazardous machinery, and who was limited to performing simple, unskilled tasks only, could not perform any of Plaintiff's exact past jobs, could not realistically perform the jobs available in hypothetical one, and could not work in any other job.

**ALJ's Decision of March 26, 2009 (Tr. 9-17)**

The ALJ stated that Plaintiff had not engaged in Substantial Gainful Activity ("SGA") during the period from her alleged onset date of January 15, 2006 through her date last insured of March 31, 2008. He noted that she had worked after her alleged onset date, but that work had been an unsuccessful attempt. He then found that she suffered from the following severe impairments: obesity, degenerative disk disease, hypertension, and anxiety. He found, however, that none of these impairments, singly or in combination, met or equaled a deemed-disabling impairment listed in the Commissioner's regulations, 20 C.F.R. § 404, Pt. 404, Subpt. P, App. 1 ("Appendix 1").

The ALJ then proceeded to find that Plaintiff possessed the Residual Functional Capacity ("RFC") to perform sedentary work except that she was limited to occasional

climbing ramps and stairs; never climbing ropes, ladders, and scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling. She was also expected to avoid concentrated exposure to industrial hazards and unprotected heights, and she was limited to jobs that involve simple tasks only.

Citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), as setting forth the relevant factors in evaluating the credibility of a claimant's allegations, the ALJ stated that while he found that Plaintiff's medically determinable impairments could reasonably be expected to cause some symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC assessment. The ALJ noted that Plaintiff's doctors failed to detect any physical abnormalities that were consistent with Plaintiff's allegations of total disability. Moreover, the ALJ noted other evidence to support the RFC, including an incident on February 6, 2007, wherein Plaintiff drove for an hour before arriving to see her doctor, but had a normal gait and affect, and an incident on October 20, 2006, wherein Plaintiff reported to her doctor that she gets relief from her pain by sitting.

The ALJ noted that while the Plaintiff's condition appeared to have deteriorated somewhat after March 1, 2008, her last date insured, this deterioration could not be used as a basis for disability for the period of time relevant to the ALJ's decision.

The ALJ also stated that while Dr. Kondro and Dr. Miles indicated that Plaintiff was unable to work, these statements were not consistent with the typical findings of Plaintiff's treating doctors at the time of Plaintiff's treatment. Moreover, Dr. Kondro's

letters were written in 2009, and did not appear to refer back to the time relevant to the ALJ's decision, and Dr. Miles's note did not specifically state that Plaintiff could not do sedentary work. The ALJ stated that for these reasons, these statements could not be given much weight.

The ALJ stated that the RFC took into consideration that Plaintiff's obesity probably limited her ability to engage in some work activities. He also stated that medical records showed that Plaintiff's anxiety and depression were under good control. Despite this, the ALJ stated that the RFC gave Plaintiff the benefit of the doubt, finding that her anxiety might interfere with her ability to concentrate at work, but allowed her to engage in unskilled work as identified by the VE.

The ALJ also stated that Plaintiff's daughter provided a report and description of Plaintiff's typical daily activities, which when compared to Plaintiff's description of herself, indicated that Plaintiff perceived herself as more limited, which the ALJ stated reflected negatively on Plaintiff's credibility.

The ALJ found that, based on the VE's testimony, Plaintiff was not able to perform any of her past relevant work, but he determined that there were jobs existing in significant numbers in the national economy that someone of Plaintiff's age, education, work experience, and RFC could perform. The ALJ indicated that Plaintiff's limitations affected her ability to perform a full range of sedentary work, but based on the VE's testimony, Plaintiff was still able to perform the requirements of representative unskilled occupations such as surveillance system monitor, sedentary; simple assembly work,

14

sedentary; and packager, sedentary. Therefore, based on the VE's testimony, and considering Plaintiff's age, education, experience, and RFC, the ALJ found that she was not disabled as defined by the Social Security Act.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any. If

16

the claimant can return to past relevant work, the claimant is not disabled. Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as depression, the Commissioner cannot carry the step-five burden by relying on the Guidelines, but must consider testimony of a VE as to the availability of jobs that a person with the claimant's profile could perform. Baker v. Barnhart, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006). Here, the ALJ decided at step five that while Plaintiff's limitations affected her ability to perform a full range of sedentary work, based upon the VE's testimony, Plaintiff was still able to perform the requirements of representative unskilled occupations such as surveillance system monitor, sedentary; simple assembly work, sedentary; and packager, sedentary.

**Plaintiff's Treating Physician's Opinions**

Plaintiff argues that the ALJ erred in discounting the opinions of Dr. Miles and Dr. Kondro, Plaintiff's treating physicians, that Plaintiff was unable to work.

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2). A treating physicians opinion that is inconsistent with the physician's own treatment notes need not be credited by an ALJ. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).

On November 7, 2006, Dr. Miles provided Plaintiff with an Information Sheet stating that due to Plaintiff's "non-work related" condition, she was "not able to return to work at this time." (Tr. 230.) On March 10, 2009 and March 12, 2009, Dr. Kondro wrote two letters to Plaintiff's counsel, which are identical but for the last sentence, stating that it was Dr. Kondro's opinion that Plaintiff had "an inability to work on a full-time basis," and that he "would deem [Plaintiff] to be permanently disabled." (Tr. 349, 351.) In his decision, the ALJ found that Dr. Miles's note "does not specifically say that [Plaintiff] would be unable to do sedentary work, and it appears to be saying that she can

18

not return to her last job at Maggie's Café."  The ALJ also found that "Dr. Kondro's letters were written in 2009, and do not appear to refer back to the time relevant to this decision, which is prior to March 31, 2008."  Accordingly, the ALJ did not give these statements "much weight."  The ALJ also found that Dr. Miles's and Dr. Kondro's statements were inconsistent "with the typical findings of the claimant's treating doctors when she went to them for treatment.  They typically reported observing nothing significantly abnormal in their physical examination."  (Tr. 15.)

As noted by the ALJ, this Court finds that the record reflects that there is no indication that Dr. Kondro's opinion in these two letters relates to the relevant time period of January 15, 2006, Plaintiff's alleged disability onset date, through March 31, 2008, Plaintiff's last date insured.  Assuming Plaintiff may have been unable to work as of March 2009, the relevant time period ended a year earlier.

Moreover, it is the ALJ's responsibility to assess Plaintiff's RFC, and to make the determination as to whether a claimant meets the statutory definition of disability under the Act.  See 20 C.F.R. §§ 404.1527(e)(1), 404.1546; Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner.").  Therefore, the ALJ properly discounted Dr. Miles's conclusion that Plaintiff was "not able to return to work at this time."  Moreover, to the extent Dr. Kondro's March 2009 letters can be interpreted as applying to the

relevant time period, the ALJ properly discounted Dr. Kondro's conclusion that Plaintiff was "permanently disabled" or had an "inability to work."

Finally, the record supports the ALJ's finding that Dr. Miles's and Dr. Kondro's statements were inconsistent "with the typical findings of the claimant's treating doctors when she went to them for treatment. They typically reported observing nothing significantly abnormal in their physical examination." While Plaintiff argues that in October 2006, Dr. Trecha recommended "no work," Dr. Trecha's treatment notes indicate that Dr. Trecha stated "We'll keep her off work *for a week* . . . ." (Tr. 240.) (emphasis added). On October 20, 2006, Dr. Miles noted that Plaintiff was taking Oxycontin for her pain, but he did not note finding her symptoms to be "severe and disabling." (Tr. 239.) In fact, Dr. Miles noted that Plaintiff had a "very clean appearing MRI" of the lumbar spine. (Id.)

On November 7, 2006, Dr. Miles indicated that Plaintiff "would like to have a note to be off work altogether," which he thought was reasonable, and that he thought she would apply for social security disability. However, Dr. Miles's own treatment notes for that date noted that "[o]n examination, [Plaintiff had] full motor function in her lower extremities" and she had an "essentially normal EMG/NCV study of her right leg" with "a little irritability of the tibial nerve proximally." (Tr. 237.) Jennifer Clark, M.D. who performed that EMG/NCV study, also reported that it was "[e]ssentially normal," with "some mild irritability in the gastric." (Tr. 255-57.)

In his treatment notes from January 16, 2007, Dr. Miles noted that Plaintiff had

visited a neurologist who reported an entirely normal neurological exam, and expressed some concern about possible psychiatric issues with Plaintiff. Dr. Miles noted that on examination, Plaintiff had full motor function of her lower extremities. Dr. Miles noted that Plaintiff may have a nonunion at 5-1, but that she also had some overlying psychiatric issues. (Tr. 286.) Dr. Meyer, Plaintiff's pain management specialist, noted that Plaintiff suffered from persistent pain and depression, but again did not note "severe and disabling" pain. (Tr. 281.)

On June 21, 2007, Dr. Graven noted that Plaintiff reported that her spinal cord stimulator was doing a "good job." (Tr. 293.) On October 1, 2007, Plaintiff reported that she was having a good day without too much back pain. (Tr. 331.) Finally, Dr. Graven's treatment notes from February 7, 2008 indicate that Plaintiff had an unremarkable physical exam, and he recommended home exercises for her pain and stiffness. (Tr. 296.)

Therefore, contrary to Plaintiff's allegation that "[h]er physicians have worked together and unanimously believe that her chronic pain limits her ability to work on a full time basis," the record supports the ALJ's determination that Dr. Miles's and Dr. Kondro's opinions were inconsistent "with the typical findings of the claimant's treating doctors when she went to them for treatment."

## CONCLUSION

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this

case de novo." <u>Wiese v. Astrue</u>, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citation omitted). "'If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's findings, [the court] must affirm the denial of benefits.'" <u>Id.</u> (quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the Court believes that the ALJ's decision should be affirmed. The Commissioner's decision is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 29th day of September, 2010.